IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**TRAVIS JAMES WEBB,**

    Petitioner,

v.                                                                   Civil Action No. **3:11CV792**

**DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS,**

    Respondent.

**MEMORANDUM OPINION**

Travis James Webb, a Virginia state prisoner proceeding *pro se*, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition"). In his § 2254 Petition, Webb argues entitlement to relief based on the following claims:

| | |
|---|---|
| Claim One: | The Court of Appeals of Virginia erred in denying his delayed appeal (§ 2254 Pet. 7);[1] |
| Claim Two: | The Circuit Court abused its discretion by sentencing Webb "'way over the guidelines'" despite Webb's long history of mental illness (*id.* at 8–9); and, |
| Claim Three: | The Circuit Court erred in finding Webb guilty given the testimony of the co-defendant (*id.* at 10). |

By Memorandum Opinion and Order entered January 31, 2013, the Court denied without prejudice Respondent's Motion to Dismiss and ordered furthering briefing raising any procedural defense and addressing Webb's claims on the merits. *Webb v. Dir., Va. Dep't of Corr.*, No. 3:11CV792, 2013 WL 394721, at *5 (E.D. Va. Jan. 31, 2013). Respondent has filed its supplemental brief. (ECF No. 20.) Webb has responded. (ECF No. 22.) The matter is ripe for disposition. As discussed below, Webb's claims lack merit and will be DISMISSED.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to citations to Webb's § 2254 Petition.

## I. PROCEDURAL HISTORY

The Circuit Court for the City of Chesapeake, Virginia ("Circuit Court") convicted Webb of two counts of abduction, one count of robbery, two counts of use of a firearm in the commission of abduction, and one count of use of a firearm in the commission of a robbery. The Circuit Court entered final judgment with respect to those convictions on June 29, 2007. *Commonwealth v. Webb*, Nos. CR05–1161 through CR05–1164, CR05–1406, and CR05–1407, at 2 (Va. Cir. Ct. June 29, 2007). On June 20, 2008, the Supreme Court of Virginia refused Webb's petition for appeal. *Webb v. Commonwealth*, No. 080358, at 1 (Va. June 20, 2008).

On March 11, 2009, Webb filed a petition for a writ of habeas corpus in the Supreme Court of Virginia. Petition for Writ of Habeas Corpus 1, *Webb v. Dir., Dep't Corr.*, No. 090465 (Va. filed Mar. 11, 2009). On September 4, 2009, the Supreme Court of Virginia denied the petition. *Webb v. Dir., Dep't Corr.*, No. 090465, at 1 (Va. Sept. 4, 2009). The Supreme Court of Virginia subsequently dismissed Webb's petition for rehearing as untimely filed. *Webb v. Dir., Dep't Corr.*, No. 090465, at 1 (Va. Jan. 19, 2010).

On July 23, 2010, Webb filed a petition for a writ of mandamus in the Circuit Court. Petition for Writ of Mandamus 1, *Webb v. Mitchell*, No. CL10–1796 (Va. Cir. Ct. filed July 23, 2010). The Circuit Court dismissed the petition on November 16, 2010, finding it untimely and finding that it requested relief that could not be granted by the Circuit Court. *Webb v. Mitchell*, No. CL10–1796, at 1 (Va. Cir. Ct. Nov. 16, 2010).

On August 29, 2011, Webb filed a second habeas petition in the Supreme Court of Virginia. Petition for Writ of Habeas Corpus 1, *Webb v. Dir., Dep't Corr.*, No. 11624 (Va. filed Aug. 29, 2011). On November 9, 2011, the Supreme Court of Virginia dismissed Webb's

2

second petition as, *inter alia*, untimely pursuant to section 8.01–654(A)(2) of the Virginia Code.[2] *Webb v. Dir., Dep't Corr.*, No. 111624, at 1 (Va. Nov. 9, 2011).

## II. THE APPLICABLE CONSTRAINTS UPON FEDERAL HABEAS CORPUS REVIEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that

---

[2] This section states, in pertinent part, that:

> A habeas corpus petition attacking a criminal conviction or sentence . . . shall be filed within two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later.

Va. Code Ann. § 8.01–654(A)(2) (West 2012).

3

determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

### III. PURPORTED ERRORS OF THE STATE COURTS

In Claim One, Webb challenges the Court of Appeals of Virginia's decision to grant a delayed appeal. In Claim Two, Webb contends that the Circuit Court abused its discretion by sentencing him over the state sentencing guidelines. Webb identifies no constitutional violation in either claim. The trial or the appellate court's alleged error provides no basis for federal habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (citing cases for the proposition that "federal habeas corpus relief does not lie for errors of state law"). Accordingly, Claims One and Two will be DISMISSED.

### IV. SUFFICIENCY OF THE EVIDENCE

A federal habeas petition warrants relief on a challenge to the sufficiency of the evidence only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The relevant question in conducting such a review is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318.

In Claim Three, Webb argues that the Circuit Court erred in finding him guilty based upon the testimony of his co-defendant, Jessica Sanford, who entered a guilty plea. (§ 2254 Pet. 10.) Webb argues that the Circuit Court should have found her testimony to be inherently incredible due to her expectation of leniency for her cooperation and testimony. (*Id.*) Webb fails to demonstrate any error of the Circuit Court as overwhelming evidence of his guilt existed.

The Circuit Court convicted Webb of two counts of abduction, in violation of section 18.2–47 of the Virginia Code,[3] one count of robbery, in violation of section 18.2–58 of the Virginia Code,[4] and three counts of use or display of a firearm in commission of those crimes, in violation of section 18.2–53.1 of the Virginia Code.[5] *Commonwealth v. Webb*, Nos. CR05–1161 through CR05–1164, CR05–1406, and CR05–1407, at 2 (Va. Cir. Ct. June 29, 2007).

During trial, the Circuit Court heard evidence that on October 26, 2004, Jason Turner and his girlfriend Keri Roberson, were alone at Roberson's parents' home. (Feb. 12, 2007 Tr. 46–47, 69.) Roberson and Turner testified that Webb came to the front door, and walked into the house before Roberson could answer the door. (Feb. 12, 2007 Tr. 47–48, 70.) Webb wanted to know the location of an individual named Shelly. (Feb. 12, 2007 Tr. 47–48, 49–50, 70–71.) Webb

---

[3] The abduction conviction required proof that Webb "by force [or] intimidation ... seize[d], [took or] detain[ed] another person with the intent to deprive [him or her of] personal liberty ...." Va. Code Ann. § 18.2–47(A) (West 2013).

[4] "'Robbery is the common law crime against the person, which is proscribed statutorily by Code § 18.2–58.'" *Seaton v. Commonwealth*, 595 S.E.2d 9, 13 (Va. App. 2004) (quoting *Clay v. Commonwealth*, 516 S.E.2d 684, 685 (Va. App. 1999)). Robbery is defined "as 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" *Id.* (quoting *Commonwealth v. Jones*, 591 S.E.2d 68, 70 (Va. 2004)).

[5] "It shall be unlawful for any person to use or attempt to use any ... firearm ... in a threatening manner while committing or attempting to commit ... robbery ...." Va. Code Ann. § 18.2–53.1.

5

informed Roberson that he believed that Roberson and Shelly[6] "got people to shoot up" Jessica Sanford's house. (Feb. 12, 2007 Tr. 71.) Roberson testified that she had purchased cocaine from Webb for approximately six months, and knew Sanford through Webb. (Feb. 12, 2007 Tr. 71–72.) Roberson and Shelly had used cocaine with Webb on the previous Saturday. (Feb. 12, 2007 Tr. 71–72.)

Webb pulled out a gun from his front pocket, placed it on the right side of Roberson's face, and asked her "[d]o you think I'm playing with you." (Feb. 12, 2007 Tr. 49, 71.) Roberson testified that Webb, pulled the trigger, but had not "cocked" the gun, so it "clicked." (Feb. 12, 2007 Tr. 71, 73.) Webb then "cocked" the gun but changed his mind and told Roberson that she and Turner "we're going to come with him to find Shelly." (Feb. 12, 2007 Tr. 71.) Webb then forced Turner and Roberson into the kitchen at gunpoint. (Feb. 12, 2007 Tr. 49–50, 73.) Webb and Turner continued arguing in the kitchen, and Webb waved a woman into the house through the side kitchen door. (Feb. 12, 2007 Tr. 50–51, 73.) The woman, Jessica Sanford, began to scream at Roberson about shooting at her house, while Webb kept the room secure at gunpoint. (Feb. 12, 2007 Tr. 51, 74.) Roberson insisted she knew nothing. (Feb. 12, 2007 Tr. 74.)

Between five and fifteen minutes later, Sanford and Webb directed Roberson and Turner out to a vehicle while Webb continued to point the gun at them. (Feb. 12, 2007 Tr. 52, 74.) Roberson "thought [she] was going to die" if she got into the vehicle. (Feb. 12, 2007 Tr. 74.) Sanford and Webb directed Roberson to take them to Shelly's location. (Feb. 12, 2007 Tr. 53.) Sanford drove while Webb pointed the gun at Roberson and Turner, who rode in the back seat. (Feb. 12, 2007 Tr. 53, 76.) Roberson explained that she did not know where Shelly was and had no idea why Webb and Sanford had involved her. (Feb. 12, 2007 Tr. 54.) Sanford drove around

---

[6] The transcript does not reveal Shelly's last name.

Chesapeake to Shelly's friends' homes and Webb wrote down the addresses and said "that those houses were going to get shot up that night." (Feb. 12, 2007 Tr. 75.) After approximately an hour, Webb and Sanford picked up a third man, "Colt," who sat beside Roberson and Turner in the back seat. (Feb. 12, 2007 Tr. 55–56, 76–77.) Turner and Roberson explained that they could not exit the car because Webb continued to point the gun at the back seat. (Feb. 12, 2007 Tr. 55–56, 77.) "Colt" had a knife that he placed next to Turner's side. (Feb. 12, 2007 Tr. 56, 77.) Webb then took the bullets out of the gun, wiped the bullets off, and gave Sanford and Colt masks. (Feb. 12, 2007 Tr. 56.) Webb instructed Colt to take Roberson's purse and cell phone and Turner's wallet and cell phone. (Feb. 12, 2007 Tr. 56–57, 67–68, 78, 82.) Webb also instructed Colt to check Turner's and Roberson's phones to see if they had any recording devices or had made any calls. (Feb. 12, 2007 Tr. 57, 78.) Sanford drove into North Carolina. (Feb. 12, 2007 Tr. 58, 78.)

After approximately two and half hours, Turner realized that Sanford, Webb, and Colt "were trying to find a place to get rid of" Turner and Sanford and "were looking for roads with no houses meaning no witnesses." (Feb. 12, 2007 Tr. 59.) Sanford suggested chaining Turner and Roberson behind her uncle's house because "her uncle was some sort of psychotic, and he would enjoy taking care of it for her." (Feb. 12, 2007 Tr. 60; *see also* Feb. 12, 2007 Tr. 79.) Instead, Sanford stopped the car in North Carolina on a dirt road next to a field with no houses. (Feb. 12, 2007 Tr. 60, 80.) Webb instructed Turner and Roberson to get out of the vehicle and to kneel down next to a ditch. (Feb. 12, 2007 Tr. 60–61, 80.) Roberson testified that Webb pointed the gun at the back of Roberson and Turner's heads. (Feb. 12, 2007 Tr. 80.) Turner heard Sanford and Webb arguing about hearing a gun shot and Sanford, Webb, and Colt got back into the vehicle and began to back up. (Feb. 12, 2007 Tr. 61–62.) Turner and Roberson crawled

down into the ditch crossed to the other side, and walked along a tall barbed wire fence for approximately one minute. (Feb. 12, 2007 Tr. 62.) Turner climbed a tree limb to observe the area and he noticed the vehicle was coming back down the road. (Feb. 12, 2007 Tr. 62.) Roberson and Turner climbed the tree, jumped over the top of the fence, and ran through the woods for at least thirty minutes to an hour. (Feb. 12, 2007 Tr. 63, 80–81.) When Roberson and Turner exited the woods, they found they were still within the electric barbed wire fence. (Feb. 12, 2007 Tr. 63, 81.) Turner found the control panel and tripped the electric wire, so the two could get over the fence. (Feb. 12, 2007 Tr. 63–64, 81.) Roberson called her parents and the police from a gas station in Elizabeth City, North Carolina. (Feb. 12, 2007 Tr. 81.)

Jessica Sanford testified that on October 26, 2004, Webb and Sanford drove to Roberson's house because Webb claimed that he needed to collect money that Roberson owed him. (Feb. 12, 2007 Tr. 84.) Webb entered the house to collect the money and then waved Sanford in the side door. (Feb. 12, 2007 Tr. 84.) Sanford noticed that Roberson had been crying, and Webb told Sanford that Roberson "had something to do with the shooting of [Sanford's] house." (Feb. 12, 2007 Tr. 84.) Sanford explained that someone had shot at her house on the previous Saturday. (Feb. 12, 2007 Tr. 88.) Roberson claimed that she did not know the responsible individuals' names, but that she would show Sanford and Webb where they lived. (Feb. 12, 2007 Tr. 89.) Sanford testified that she was "looking for someone named Shelly." (Feb. 12, 2007 Tr. 84.) Sanford explained that they drove around for approximately an hour and a half while Webb had Roberson "point out the houses of where the people were that were involved in the shooting of [Sanford's] house" and Webb noted the addresses. (Feb. 12, 2007 Tr. 86.) Sanford drove to Elizabeth City to find Shelly who was "with one of the persons who had . . . masterminded the shooting of [Sanford's] house . . . ." (Feb. 12, 2007 Tr. 86.)

8

Sanford denied that Webb held a gun until they arrived in North Carolina. (Feb. 12, 2007 Tr. 85.) Sanford testified that Webb instructed Colt to take Roberson's purse and jewelry. (Feb. 12, 2007 Tr. 85.) Webb, Sanford, and Colt dropped Roberson and Turner off on a sand road next to cotton field. (Feb. 12, 2007 Tr. 86.) Sanford testified that she "left them in Carolina because I wanted to get them away from him." (Feb. 12, 2007 Tr. 87.)

Sanford explained that she was charged for this incident and pled guilty to the two abduction counts and two use of a firearm in the commission of a felony counts. (Feb. 12, 2007 Tr. 87.) She also testified that she had not yet been sentenced, had served twenty-three months in custody, was currently on bond, and that no one had made any promises in exchange for her testimony. (Feb. 12, 2007 Tr. 87–88, 91–92.) The judge again asked Sanford whether the Government had made any promises to her for her testimony and Sanford stated that she hoped for a lesser sentence. (Feb. 12, 2007 Tr. 91–92.)

Contrary to Webb's assertion that the Circuit Court erred in finding him guilty based upon Sanford's testimony, the Court also heard the overwhelming evidence of Webb's guilt from two additional witnesses. Sanford's testimony was consistent with the testimony of both Turner and Roberson. The evidence consistently demonstrated that Webb forced Turner and Roberson into the vehicle and drove them to North Carolina, held them at gun point, robbed them, and then abandoned them on the side of the road.

Additionally, the Court specifically asked Sanford about her guilty plea and any promises made in exchange for her testimony. In convicting Webb of the five counts, the Court implicitly found Sanford's testimony credible. Thus, after reviewing the evidence and credibility determinations "in the light most favorable to the prosecution, [a] rational trier of fact could have

9

found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson*, 406 U.S. at 362). Accordingly, the Court will DISMISS Claim Three.

## V. CONCLUSION

Webb's § 2254 Petition will be DENIED and the action DISMISSED. A certificate of appealability will be DENIED.[7] Webb also filed a motion for an extension of time in which to mail copies of his "notarized legal documents and mental and medical records . . . [to the] Office of the Attorney General." (ECF No. 23, at 1.) Respondent has access to Webb's submissions to the Court through the Court's electronic filing system. Additionally, any delay in mailing documents to Respondent has no bearing on the Court's resolution of Webb's case. Accordingly, Webb's motion will be DENIED AS MOOT.

An appropriate Final Order shall issue.

Date: 10-1-13
Richmond, Virginia

/s/
James R. Spencer
United States District Judge

---

[7] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Webb fails to meet this standard.